912 So.2d 48 (2005)
Marvin SAVAGE, Henry H. Hu, Frank La Forgia and Josephine La Forgia, heirs of Anna H. Taliercio, James A. Ripa, The Estate of Lee Samiljan, Francis Rorick and Helen Rorick, Joseph Salemi and Delores Salemi, Trustees, Appellants,
v.
PALM BEACH COUNTY, a Political Subdivision of the State of Florida, Appellee.
No. 4D04-3530.
District Court of Appeal of Florida, Fourth District.
August 31, 2005.
Rehearing Denied October 20, 2005.
*49 Christopher V. Carlyle, Shannon McLin Carlyle, and Gilbert S. Goshorn, Jr., of Carlyle Appellate Law Firm, The Villages, and Michael D. Jones of Michael D. Jones & Associates, P.A., Winter Springs, for appellants.
Leonard Berger, West Palm Beach, for appellee.
MAY, J.
Property owners appeal a judgment in an inverse condemnation action. They argue the trial court erred in excluding their experts from testifying about "property blight" and its effect on the value of the condemned property. We agree and reverse.
The property is located in an area known as Unit 11. It is comprised of a 1760 acre tract of land, which was subdivided into lots in the early 1970s. In 1975, permits were issued to construct a road and drainage system in Unit 11 to accommodate construction of single family homes. The permits were based on a reclamation plan to control and conserve water in Unit 11.
The 1975 permits did not facilitate flood control. As a result, the subdivided lots and roads in Unit 11 were susceptible to periodic flooding. In response to that problem, roads permitted in 1975 were closed and property owners and visitors were required to release and indemnify the Indian Trails Improvement District (ITID) due to the unsafe conditions caused by flooding.
In 1988, the South Florida Water Management District (SFWMD) and the ITID acknowledged the infrastructure failed to provide for adequate stormwater and flood control. In 1989, SFWMD and ITID reached an agreement in which ITID agreed to obtain permits and construct improvements to the drainage system in Unit 11.
Since that time, the ITID has been unable to obtain the permits necessary to build the agreed upon improvements from SFWMD, the United States Army Corps of Engineers (Corps), and the State of Florida Department of Environmental Protection. As a result, there have been no improvements to Unit 11's existing drainage system. No houses have been constructed on Unit 11, and the property remains unsuitable for residential development.
In 1996, the County began to purchase parcels from "willing sellers" in Unit 11. Those who were not "willing sellers" would have their property condemned. Between 1996 and September 2003, the County purchased over 1000 parcels through the "willing seller" program at prices ranging from $4050 to $6000 per acre with funds obtained through a mitigation program administered in cooperation with the Corps and SFWMD.[1]
*50 At one point, a private developer, Bear's Club, directly purchased land in Unit 11 for mitigation purposes at a substantially higher price. Following that transaction, the County's appraiser opined in a memorandum:
If there is no agreement between the County and the agencies, the Bear's Club sale will likely be followed by others like it, and it will then have set a precedent. If the time period between the current date and the signing of the agreement is lengthened, the Bear's Club sale may influence remaining sellers in Unit 11 as they become aware of the sale. If there were another sale to a developer in the interim, that sale and the Bear's Club sale could change the value structure of Unit 11 and also influence condemnation proceedings. However, it is likely that the agreement will be signed due to the financial risks for the County . . . .
(Emphasis added).
In 2000, the County passed a resolution to authorize acquisition of Unit 11 lands by various means, including condemnation of the remaining parcels in Zone 1 of Unit 11. The County later adopted resolutions to purchase properties in Zones 2 and 3 of Unit 11. The property owners in this case own land in Zone 3.
On October 31, 2002, the County initiated condemnation proceedings against the property owners. The property owners hired two registered engineers. A report of one of these engineers, John T. Bell, stated:
Based on our historical research of Unit 11, Palm Beach County appears to have conspired with other Federal and State agencies to prevent individual property owners from building on their lots for the express purpose of returning the Unit 11 area to its natural state prior to the construction of the C18 canal.
The property owners then hired two appraisers. One of the two appraisers, Dr. Barry Diskin, reported:
For the purposes of this appraisal report, we have assumed that it is reasonably probable that [the subject property], like the rest of Unit 11, would have had a similar absorption as the rest of The Acreage had they not been stopped by governmental interference. Our opinion of the market value for the subject property is based on the assumption that the highest and best use for the subject property is for residential development similar to that of The Acreage.
In deposition, Dr. Diskin acknowledged that his opinion was dependent upon the engineers' reports. He also testified that if the engineers' assumptions were false, he would have to prepare a new analysis.
The County filed motions in limine to exclude the testimony of the property owners' two engineers and two appraisers. The property owners proffered their testimony.
Mr. Bell testified that Unit 11 had not been permitted because "the very agencies that they needed to get the permit [from] wanted it to be used as a wildlife corridor," and had therefore intentionally not issued the permits. Mr. Shalloway, the other engineer reached the same conclusion.
Steven Matonis, an appraiser, opined the area had been blighted since 1996 as a result of the County's condemnation proceedings. In his opinion, the only reason why Unit 11 had not been developed was because of restrictions placed on it by the County. He believed that property outside Unit 11 had to be considered to accurately determine its value. After looking at over 100 sales, he appraised the properties from $31,000 to $46,000. Dr. Diskin proffered that each of the five properties had a value of $41,500.
*51 The trial court granted the motion in limine as to the engineers. The court opined:
[t]o allow Mr. Bell and Mr. Shalloway to offer such opinions as to why they believe any permits were denied would essentially force Palm Beach County to defend the permitting decisions of other State and Federal government agencies when any person or entity aggrieved by such permitting decisions has the ability to appeal those decisions under the applicable substantive law and Chapter 120 of the Florida Statutes.
The trial court also granted the motion in limine as to the appraisers. It ruled the appraisers' opinions to be improperly based on the unsupported, speculative assumptions of the engineers.
Accordingly, appraisers, Dr. Barry Diskin and Steven Matonis, cannot offer an opinion that the highest and best use of the parcels at issue in this case is for use as single family home sites similar to such sites in The Acreage, and cannot offer an opinion as to the value of the subject parcels under this speculative highest and best use, where this use is dependent upon the permitting and construction of the various, speculative drainage and infrastructure improvements in Unit 11, that did not exist at the time of the taking, do not exist now, and are not likely to exist in the reasonably foreseeable future.
At trial, the County presented the testimony of Robert Banting, an expert appraiser. He opined the value of one acre in Unit 11 was $6000. He had reviewed comparable sales, which revealed a one-time high sale of $9800 per acre to the Bear's Club developers. Mr. Banting considered this to be an anomaly.
Further, he explained condemnation blight as the adverse effect on the value of property that occurs when a government announces its intent to condemn the property. He conducted a 20-year analysis of the price trends in the area and determined that condemnation blight was not present in Unit 11. His analysis revealed a slow, upward trend in values over the last 21 years that remained unchanged despite the County's action to purchase or condemn the properties. In fact, he opined the County's entry in the market could have positively affected the upward trend in price. The County presented a second appraiser, who testified that he observed no decrease in property values in Unit 11 after the County announced its decision to condemn the property.
In contrast, Dr. Diskin had prepared an exhibit that indicated a steady increase in property values in Unit 11 from 1996 to the present. However, he was not allowed to present his proffered testimony.
The jury returned a verdict based on a value of $6000 per acre. It is from this judgment that the property owners appeal.
The property owners argue the trial court erred when it excluded their experts' testimony. The County argues the trial court correctly excluded the engineers' testimony concerning a government conspiracy because it was beyond the scope of their expertise and "sheer fantasy in any event." It contends the trial court properly excluded the appraisers' testimony because it was based on the flawed analysis of the engineers. The County also maintains the experts' testimony concerning "condemnation blight" was raised by the property owners at the eleventh hour and was properly excluded.
On the timeliness issue, the County is simply wrong. The County's own motion in limine quotes a passage of the engineer's report where he opines the County's actions have "created a blight in Unit 11." The property owners addressed the issue *52 in their response, and it was argued at the hearing on the motion in limine. In fact, the County attorney agreed that condemnation blight was a proper issue for the jury to consider.
The trial court erred in excluding the property owners' expert testimony on substantive grounds. Both the state and federal constitutions "insure that the property owner will be adequately and fairly compensated in money for that property which is taken from him. These provisions and the statutes implementing them are designed to protect the owner against confiscation of his property." State Rd. Dep't v. Chicone, 158 So.2d 753, 756 (Fla.1963). Chicone recognized "the threat of condemnation restricts the owner's economic use of property in the interim leading to the actual taking, as it did in this case. It prevents the owner from putting his property to the highest and best use. It would be neither fair, equitable or just to compensate him for value of his property as established by such limited and restricted use." Id. at 758. Here, the property owners were deprived of the opportunity to prove the fair value of their property. Moreover, our supreme court held that "a condemning authority cannot benefit from a depression in property value caused by a prior announcement of the intent to condemn." Dep't of Transp. v. Gefen, 636 So.2d 1345, 1346 (Fla.1994) (citation omitted).
Here, the jury was prevented from hearing relevant testimony concerning the lost potential value of property in Unit 11, how it occurred, and when. The engineers' testimony was within their expertise with regard to the suitability of residential development of Unit 11 land, the permitting process, and whether the County was responsible for any condemnation blight. The jury should have been permitted to consider and assign weight to the testimony of the property owners' expert engineers.
This error was exacerbated when it undermined the foundation for the property owners' appraisal experts and led to the exclusion of their testimony. Once the property owners' experts were prohibited from relying upon the opinions of the engineers, their appraisals were effectively gutted.
In Florida Department of Transportation v. Armadillo Partners, Inc., 849 So.2d 279 (Fla.2003), our supreme court addressed the importance of expert testimony in condemnation cases.
[A]n appraiser's opinion may be subject to impeachment or to having its weight reduced because of its failure to properly consider one of the many factors that may influence an opinion as to value, but that failure should not prevent the opinion's admission, nor cause its complete exclusion from the jury's consideration.
Id. at 287-88 (citations omitted).
We hold the trial court erred in excluding the testimony of the engineers. They had the requisite expertise to render opinions based on their experience with the permitting issues as they concerned Unit 11. We agree their references to "government conspiracies" and "collusion" were inappropriate. However, the court could have restricted the use of that terminology without striking the experts' testimony completely.
For these reasons, the judgment is reversed and the case remanded for a new trial consistent with this opinion.
STONE and FARMER, JJ., concur.
NOTES
[1] Mitigation funds are monies donated to the County by developers to offset the environmental impact of their development.