# Third District Court of Appeal

## State of Florida

Opinion filed September 30, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-963
Lower Tribunal No. 04-21282
_____


**Ann Teitelbaum, et al.,**
Appellants,

vs.

**South Florida Water Management District, an Agency of the State of Florida,**
Appellee.


An Appeal from the Circuit Court for Miami-Dade County, Peter R. Lopez, Judge.

Moore Bowman & Rix, P.A., and Gregory S. Rix and S. William Moore (Tampa), for appellants.

James E. Nutt (West Palm Beach), and Francisco J. Pines, for appellee.

Alachua County Attorney's Office, and Sylvia E. Torres (Gainesville); and Bay County Attorney's Office, and Terrel K. Arline (Panama City), for The Florida Association of County Attorneys, as amicus curiae.

Anna H. Upton (Tallahassee), for National Audubon Society and Florida Audubon Society, as amici curiae.

Before ROTHENBERG, SALTER, and SCALES, JJ.

<u>ON MOTION FOR REHEARING</u>

ROTHENBERG, J.

We grant the appellants' motion for rehearing, withdraw our opinion filed June 24, 2015, and issue the following opinion in its stead.

Ann Teitelbaum and a group of private property owners ("the Plaintiffs") appeal the trial court's order granting final summary judgment against their claims for inverse condemnation and de facto constitutional takings in violation of their due process rights, which they pursued under a theory of "condemnation blight." However, Florida law is quite clear that condemnation blight, while relevant to the valuation of property that has actually been taken under existing constitutional standards, does not independently give rise to a de facto takings claim. Because we see no reason to deviate from that principle, we affirm.

## **BACKGROUND**

The Plaintiffs are all owners of property in the Bird Drive Basin area of western Miami-Dade County. The Bird Drive Basin comprises 3550 acres of partially reclaimed swamp and wetlands along the eastern edge of the Florida Everglades. The land has been subject to various county zoning requirements

2

since 1938 and has been zoned exclusively for agricultural use since 1965. The Plaintiffs all acquired their property in the Bird Drive Basin between 1971 and 2003, apparently hoping that the land would eventually be rezoned for commercial or residential use.

The South Florida Water Management District ("the Water District"), which was created by the Florida legislature in 1972 to oversee the use and conservation of Florida waters, designated the Bird Drive Basin as part of the "East Coast Buffer" to the Florida Everglades in 1994. The East Coast Buffer runs from Palm Beach to Homestead along the eastern edge of the Florida Everglades. According to the Water District, the East Coast Buffer is necessary to prevent massive flooding throughout Miami-Dade County and also to prevent saltwater intrusion from contaminating the freshwater wellfields responsible for supplying Miami and other outlying areas. The property at issue is obviously crucial to the Water District's plan to preserve the East Coast Buffer, and the Water District passed resolutions in 1995 and 1998 publicly announcing its intent to oppose any attempts to rezone the land or allow further development of the property in the East Coast Buffer.

The Water District, as part of the Comprehensive Everglades Restoration Project ("CERP") approved by the United States Congress, began attempting to acquire all the property in the East Coast Buffer, including the Bird Drive Basin

area, by purchasing the property from willing landowners. The Water District was able to purchase much of the land from willing sellers over the following two years, and then, in June 2002, it passed a condemnation resolution to acquire the remaining land (approximately 410 acres of property) from the Plaintiffs through eminent domain. Despite passing the resolution, the Water District did not attempt to formally acquire any of the land.

The Plaintiffs filed suit in October 2004, alleging "coercive acquisition policies" and "illicit actions" by the Water District that deprived the Plaintiffs of substantial use and enjoyment of their land. The gist of the Plaintiffs' complaint is that the Water District artificially depressed their property values through governmental action as part of its plan to acquire the Plaintiffs' land on the cheap. More specifically, the Plaintiffs allege that the Water District has prevented the development of the land in and around the Bird Drive Basin in order to keep the cost of the property artificially low. The Plaintiffs aver that the property has remained agricultural in nature rather than urban or residential because the Water District has actively prevented Miami-Dade County from rezoning the area by moving the urban development boundary ("UDB"), despite public demand for development, at least partially because the Water District needed the land for its buffer zone. Property within the UDB can accommodate six residential units per

4

acre, while property outside the UDB can only accommodate one residential unit per five acres.

Miami-Dade County meeting minutes and an affidavit from the Miami-Dade County Director of Planning and Zoning (from 1992-2001) arguably reflect that the County would have at least considered rezoning the area for further development if not for the actions of the Water District. Further, during the "voluntary acquisition" process, the Water District acquired land in the Bird Drive Basin area in a "checkerboard fashion" such that the Plaintiffs' properties were interspersed with government land.

In April 2008, four years after the Plaintiffs filed this case, the Water District officially withdrew its condemnation resolution and abandoned its plan to acquire the Plaintiffs' properties because various studies showed that the Bird Drive Basin recharge plan was no longer feasible. Thereafter, the Plaintiffs amended their complaint to allege that the Water District's "voluntary acquisitions" left the area checkered with largely unusable, undevelopable, and unsellable property. There is no evidence, however, that the Plaintiffs' property values have been substantially diminished or that their rights have been altered since purchasing the property; and as previously stated, the Plaintiffs' land and surrounding property were zoned for agricultural use only at the time the Plaintiffs purchased the property, and that agricultural zoning designation has not changed.

Despite the fact that there has been no change to the permitted use of, intrusion onto, or interference with the Plaintiffs' property, the Plaintiffs claim that, based on the Water District's actions, the Water District has taken their property in violation of the Takings and Due Process Clauses in both the Florida and United States Constitutions and that they are entitled to full compensation via inverse condemnation. The Plaintiffs premise their takings claims upon a theory of "condemnation blight," which they argue should be considered a de facto taking under the law. After denying several motions to dismiss the Plaintiffs' claims and an initial summary judgment motion, the trial court granted summary judgment in the Water District's favor on all claims on March 27, 2014, specifically finding that "condemnation blight" is merely a factor to be considered during the valuation phase of condemnation (or inverse condemnation) proceedings assuming that a taking has already occurred, not an independent cause of action for a constitutional taking under Florida law, and the defendants have therefore not "taken" the property in question. This appeal followed.

## ANALYSIS

Both the Florida and the United States Constitutions protect against unbridled state seizures of private property by requiring a governmental entity wishing to acquire such land to (1) demonstrate that the appropriation is for a public use or purpose and (2) pay a full and fair amount for the appropriation.

6

Specifically, the United States Constitution provides, "private property [shall not] be taken for public use, without just compensation," U.S. Const. amend. V, while the Florida Constitution mandates, "No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." Art. X, § 6, Fla. Const.

In typical takings cases, the state entity files a petition of condemnation, § 73.021, Fla. Stat. (2004), a twelve-person jury determines what amount is equal to "full compensation" for the property, § 73.071, Fla. Stat. (2004), the state entity pays the amount the jury has determined, and the condemning authority takes title to the property it sought to acquire, § 71.111, Fla. Stat. (2004).[1]  In such cases, the state takes full title to the condemned property, and there can be no doubt that the property has in fact been taken and that the owner is entitled to full compensation. Such takings are lawful, de jure takings.

However, a taking can also occur when the state or one of its agents, through certain actions or regulations, exercises domain over private property so as to deprive the rightful owner of his or her use and enjoyment without going through the proper procedures.  In such cases, a de facto taking occurs, and the property

_____

[1] There is also a "quick-taking" option outlined in Chapter 74 of the Florida Statutes that allows the State to deposit a reasonable sum into the court registry and immediately take title to the property, with the jury valuation phase occurring after the condemning authority has acquired the land.  See § 74.061, Fla. Stat. (2004).

owner is entitled to full compensation just as if the state had lawfully condemned the property. Indeed, as this Court recently held: "Where no formal exercise of eminent domain power is undertaken, a property owner may file an inverse condemnation claim to recover the value of property that has been de facto taken." Fla. Dep't of Env. Prot. ex rel. Bd. of Trs. of Internal Improvement Fund v. West, 21 So. 3d 96, 98 (Fla. 3d DCA 2009). Thus, a property owner must demonstrate that the property has in fact been "taken" by a governmental entity before being entitled to full compensation via inverse condemnation.

Whether or not governmental action results in a de facto taking has been a thorny area for both state and federal courts. See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 539 (2005) ("[O]ur regulatory takings jurisprudence cannot be characterized as unified . . . ."). However, the United States Supreme Court summarized the existing jurisprudence on this issue by holding that a per se taking occurs "where government requires an owner to suffer a permanent physical invasion of her property," or where the government passes and applies "regulations [that] completely deprive an owner of 'all economically beneficial us[e]' of her property.'" Id. at 538 (quoting Lucas v. S. Carolina Coastal Council, 505 U.S. 1003, 1019 (1992)) (emphasis and alteration in original). If a court finds that either of these two conditions has occurred, the governmental action necessarily constitutes a taking, and full compensation must be paid for the property. Id.

8

Alternatively, if a plaintiff alleges that a governmental regulation has substantially devalued the property in question without creating a physical invasion or depriving the owner of all economically beneficial use, the regulation will be analyzed under the ad hoc test established in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978). The Penn Central test requires a court to examine the totality of the deprivation, but with special emphasis on

> [t]he economic impact of the regulation on the claimant . . . , particularly, the extent to which the regulation has interfered with distinct investment-backed expectations . . . . [as well as] the character of the governmental action. . . . [which is more likely to be construed as a taking] when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

Id. at 124 (citations omitted). Whether a takings claim is analyzed as a per se taking under one of the two categories specified in Lingle or an ad hoc taking under Penn Central, the core question is whether the "actions . . . are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle, 544 U.S. at 539.

Likely recognizing that the Water District's conduct would not constitute a taking under the traditional takings formulations,[2] the Plaintiffs have not argued

---

2 Indeed, the Plaintiffs have never alleged the Water District's conduct to be a physical taking, and they have argued many times that they were NOT claiming that a regulatory taking had occurred so that they could circumvent the trial court's ruling that any potential regulatory taking claim was not ripe under Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473

their claims under any of these three well-established standards. Rather, the Plaintiffs urge this Court to recognize a new cause of action and adopt a new category of governmental activity that will result in a per se taking: condemnation blight. Under the Plaintiffs' proposed formulation for a condemnation blight claim, a constitutional taking would occur when: (1) the government makes an official, publicly-announced declaration of its intent to condemn the property that goes beyond mere planning; (2) the government engages in some post-announcement unreasonable conduct, such as protracted delay in actual condemnation proceedings or interference with the property owner's rights; and (3) the property suffers impairment of value or the property owner's use and enjoyment of the property is disrupted. We decline to adopt this proposed standard as a per se taking.

Florida cases have routinely referred to "condemnation blight" as the depreciation of property value that occurs when the government announces its intentions to condemn a property, and Florida law addresses this diminution in value by requiring the condemning authority to pay full compensation for the property as of the date of the condemnation announcement rather than at some

U.S. 172, 186-87 (1985) (reversing a takings clause claim award by holding that the plaintiff's claims were not ripe because it had not applied to the proper zoning authority for a ruling or variance to determine the actual impact of the regulation before filing suit). The Plaintiffs in this case concede that they have not applied for a variance or sought a final ruling regarding permitted uses of their allegedly taken property.

later point after the property has depreciated due to the impending condemnation. E.g., Dade Cnty. v. Still, 377 So. 2d 689, 690 (Fla. 1979); State Road Dep't of Fla. v. Chicone, 158 So. 2d 753, 757-58 (Fla. 1963); West, 21 So. 3d at 98; Savage v. Palm Beach Cnty., 912 So. 2d 48, 51-52 (Fla. 4th DCA 2005); Brown v. Dep't of Transp., 884 So. 2d 116, 117 (Fla. 2d DCA 2004). However, no Florida case has found condemnation blight itself to be an actionable claim for a constitutional taking. See Florio v. City of Miami Beach, 425 So. 2d 1161, 1162 (Fla. 3d DCA 1983) (per curiam) (affirming the trial court's dismissal of a plaintiff's claim for condemnation blight). Thus, under current Florida law, condemnation blight is only relevant to the valuation of the taken property after a plaintiff has already established that a taking has occurred either by de jure condemnation via eminent domain proceedings or de facto condemnation via one of the three established tests; it is not itself an independent grounds for a de facto taking. We believe these holdings to be fair and correct.

The Plaintiffs would have us focus on the alleged unreasonableness of the Water District's conduct to justify this new cause of action rather than on the effect on their property. This perspective confuses the aim of the Takings Clause, as the cases uniformly analyze the effect of the governmental actions and regulations on the property to determine whether they are so onerous as to constitute an ouster. See Lingle, 544 U.S. at 539.[3] That is not to say that the government can never

11

"take" land by declaring its intent to condemn and then engaging in unreasonable activities. Such governmental behavior will still be actionable if it satisfies one of the per se takings tests from <u>Lingle</u> or the ad hoc takings test from <u>Penn Central</u>. There may well be a case in the future where governmental conduct similar to the type alleged in this case could satisfy one of these existing tests; however, the Plaintiffs in this case have not even attempted to establish those facts, and we refuse to recognize a novel takings theory to fit the facts of this case.

---

[3] One of the appellants' primary arguments in their motion for rehearing is that this Court should have analyzed their Due Process Clause claims as a distinct cause of action separate and apart from their Takings Clause claims under the authority of <u>Tampa-Hillsborough County Expressway Authority v. A.G.W.S. Corp.</u>, 640 So. 2d 54, 57-58 (Fla. 1994). While there is an interplay between these two constitutional clauses and many takings claims are analyzed coextensively with due process claims, the appellants are correct that these claims can be pled as distinct causes of action when the allegations involve governmental actions or regulations on private property. <u>Id.</u> The alleged unreasonableness of the Water District's actions, while irrelevant for a takings analysis, would certainly have been germane to the Plaintiffs' substantive due process claim, and their argument would likely require further consideration had it been raised prior to the Plaintiffs' motion for rehearing. In this case, however, the trial court treated both causes of action as coextensive and made no separate findings or rulings regarding the Plaintiffs' due process claim. The appellants did not challenge that aspect of the trial court's decision below, did not brief or argue that issue before this court—indeed, they did not even independently cite the <u>A.G.W.S.</u> decision in their initial or reply brief—and now raise this point of error for the first time in their motion for rehearing. As such, the appellants have waived that issue, Fla. R. App. P. 9.330(a) ("A motion for rehearing . . . shall not present issues not previously raised in the proceeding."); <u>see also</u> Caldwell v. Fla. Dep't of Elder Affairs, 121 So. 3d 1062, 1064 (Fla. 1st DCA 2013) (citing numerous cases holding that an issue not raised in a party's initial brief is deemed waived), and we do not comment on the merits of that claim.

The Plaintiffs purchased undeveloped wetland on the border of the Everglades when that land was already zoned exclusively for agricultural use. No further restrictions were ever placed on the property; its zoning was simply never increased to allow greater residential or business use as the Plaintiffs may have expected. The Water District simply announced its intention to someday acquire the land for the general public welfare and then eventually decided the plan was unfeasible. It is undisputed that the Plaintiffs' property rights have not been substantially diminished. In fact, the Plaintiffs still have the same rights and interests in their respective properties now as when they purchased them. The fact that the property did not ultimately get rezoned and appreciate into land that could be developed for residential use is irrelevant; the State of Florida is not an insurer for the risk individuals take when they purchase property with the expectation or hope that the property may someday increase in value. The Plaintiffs have not alleged a taking under any of the three recognized takings tests, and we decline to recognize an alternative per se taking claim based on condemnation blight.

Affirmed.