# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

————————————————

No. 1D16-4839

————————————————

FLORIDA FISH AND WILDLIFE
CONSERVATION COMMISSION,

      Appellant,

      v.

WILLIAM DAWS, JR., OUIDA
GERSHON, BILL I. HINES, REGINA
HINES, HERSHAL O. HOLT,
KAREN A. HOLT, ALAN E.
JOINER, MONICA L. JOINER,
MARY B. KING, SARA KING,
BETTY TOLBERT, RICKY W.
TOLBERT, and JERRY
VARNADORE,

      Appellees.

————————————————

On appeal from the Circuit Court for Leon County.
Karen Gievers, Judge.

August 16, 2018

ON MOTION FOR REHEARING AND MOTION FOR CERTIFICATION

ROWE, J.

    We deny Appellees' motion for certification, but grant in part Appellees' motion for rehearing, withdraw our opinion dated April 10, 2018, and substitute the following opinion in its place.

*  *  *

The Florida Fish and Wildlife Conservation Commission (FWC) appeals an order granting a temporary injunction requiring the FWC to stop deer hunters and their dogs from trespassing onto Appellees' private property. The FWC also appeals the denial of its motion for summary judgment. We reverse the order in its entirety, dissolve the injunction, and remand for entry of final summary judgment in favor of the FWC.

## I. Background

The Blackwater Wildlife Management Area (Blackwater WMA) is located in the Blackwater State Forest and is composed of more than 200,000 acres of public land in Okaloosa and Santa Rosa counties. Interspersed within the Blackwater WMA are a number of private parcels of land, or inholdings, that abut or are completely surrounded by public lands.[1] Over the years, the State acquired more and more land within the Blackwater State Forest, resulting in an increasing number of inholdings – including properties owned or leased by Appellees. *See* § 375.041, Fla. Stat.

The FWC regulates hunting on public lands in Florida, including the Blackwater WMA. The FWC determines the types of hunting that will be permitted, authorizes specific areas for hunting, schedules hunting seasons for different types of game, and issues hunting licenses and permits. The hunting at issue in this case, deer dog hunting, has been authorized in the Blackwater WMA since at least the 1950's. During the deer dog hunting season, hunters use dogs trained to flush deer out of

---

[1] The patchwork-like composition of the Blackwater WMA is the result of Florida's land acquisition program whereby the State purchases private property for conservation and recreational purposes. Florida Fish & Wildlife Conservation Commission, http://myfwc.com/media/4204289/BLACKWATER.pdf (last visited Mar. 5, 2018).

2

thickets in the forest or dogs trained to follow deer trails through the forest. While in pursuit of deer, the dogs and hunters occasionally leave the public lands where the FWC has authorized hunting and trespass onto private property.

On multiple occasions, deer hunters and their dogs trespassed onto Appellees' private property; Appellees repeatedly complained to the FWC about these trespasses. Appellees also reported a number of criminal acts allegedly committed by the hunters including trespasses, threats to destroy Appellees' property, threats to Appellees' personal safety, several arson fires, and graffiti painted on Appellees' property.

In response to Appellees' complaints, the FWC took several actions to curtail the trespasses onto Appellees' property. The FWC limited the length of the deer dog hunting season to forty-four days per year, restricted the geographic area in which deer dog hunting was authorized within the Blackwater WMA, and installed fencing to separate the public lands from Appellees' private property. The FWC also adopted a responsible hunter rule, which authorized game wardens to respond to calls from private property owners when trespassing deer dog hunters or their dogs enter private property. And most recently, in 2016, the FWC required, as a condition of issuing licenses and permits for deer dog hunting, that hunters equip their dogs with corrective collars that allow the hunters to control the movements of their dogs by shocking remotely any dog that trespasses onto private property. Despite these efforts by the FWC, trespasses continued to occur. Appellees argue that the FWC is responsible for the trespasses, as it licenses and permits deer dog hunting in the Blackwater WMA and regulates hunting by rule, and they assert that the FWC must prevent further trespasses by hunters and their dogs onto Appellees' private property.

## II. Procedural History

In 2016, Appellees filed a two-count complaint seeking to prevent the FWC from issuing deer dog hunting licenses and permits in the Blackwater WMA. They alleged that the FWC's decision to allow deer dog hunting on state-owned land directly led to the trespasses on their privately-owned land by hunters

3

and their dogs. Appellees contended that these trespasses were so serious that they rose to the level of an inverse condemnation because Appellees were deprived of their right to exclude people from their private property ("takings claim"). Appellees further contended that the trespasses constituted a nuisance because the trespasses deprived Appellees of their right to the quiet enjoyment of their property. To support this contention, Appellees complained that the trespassing dogs were disruptive and potentially dangerous to livestock; it was unsafe for Appellees to go into their yards during deer dog season; fences did not stop the trespasses; and the trespasses prevented Appellees from hunting on their own property ("nuisance claims"). Appellees also sought an injunction requiring the FWC to abate the nuisance of the trespasses by hunters and their dogs onto their private property.

The FWC moved for summary judgment on the takings claims and nuisance claims. The FWC argued that because Appellees failed to plead the required elements of a takings claim, no constitutional claims had been stated against the FWC and its sovereign immunity had not been waived. The FWC argued that the doctrines of separation of powers and sovereign immunity barred the nuisance claims because the FWC owed no duty to Appellees to prevent trespasses on their property and because the FWC's decision to authorize deer dog hunting in the Blackwater WMA was a discretionary decision, not subject to challenge in the courts. Finally, with regard to Appellees' request for an injunction, the FWC contended that the injunction was overbroad and impossible to comply with.

The trial court conducted an evidentiary hearing on Appellees' request for an injunction and the FWC's motion for summary judgment. The trial court denied the summary judgment motion, rejecting the FWC's sovereign immunity arguments as a matter of law. With regard to Appellees' request for an injunction, Appellees conceded that the court could not order the FWC to stop issuing deer dog hunting licenses and permits or to redraw the map of the areas where deer dog hunting was authorized. However, Appellees argued that the court could enter an injunction ordering the FWC to stop further trespasses onto Appellees' property by the hunters and their dogs

4

and that the FWC could take whatever steps it deemed necessary to achieve that goal. The court entered the injunction, ordering the FWC "to abate the nuisance of the deer hunting dogs from trespassing onto the property of the plaintiffs, and of the deer dogs and their hunters from interfering with the plaintiffs' right to the quiet enjoyment of their private property."

The FWC appealed, and the trial court's order was automatically stayed, preventing the injunction from going into effect. *See* Fla. R. App. P. 9.310(b)(2). Appellees moved to vacate the automatic stay of the injunction in an effort to prevent trespasses by hunters and their dogs onto Appellees' property during the 2017-2018 hunting season. During the hearing on the motion to vacate the automatic stay, Appellees testified to trespasses on their property during the 2016 hunting season – testimony identical in character to that offered during the hearing on the original injunction. The trial court entered an order vacating the automatic stay, and while acknowledging that "it would be overreaching for the Court to direct the FWC not to physically release the licenses and permits for the upcoming hunting season," the court nonetheless concluded that the "FWC is on notice its actions in issuing licenses and permits constitute a nuisance and contribute to the interference with the plaintiffs' right to the quiet enjoyment of their private property, and there is no other way to protect those constitutional rights at this juncture than to vacate the stay." This Court reinstated the automatic stay by order issued October 6, 2017.

### III. Analysis

We agree with the FWC that the order on appeal should be reversed for three reasons. First, the FWC was entitled to summary judgment on Appellees' takings claims on sovereign immunity grounds because Appellees did not plead the required elements to allege valid constitutional claims. Second, the FWC was entitled to summary judgment on the nuisance claims on sovereign immunity grounds because the FWC owed no duty to Appellees and because the authorization of deer dog hunting in the Blackwater WMA was a discretionary function of the FWC. Third, the trial court erred in entering the injunction because the

5

injunction violated the separation of powers doctrine and was overly broad.

## A. Sovereign Immunity

Sovereign immunity "protects the state from burdensome interference from the performance of its governmental functions and preserves its control over state funds, property and instrumentalities." *Davis v. State, Dep't of Corr.*, 460 So. 2d 452, 461 (Fla. 1st DCA 1984) (citation omitted). "In Florida, sovereign immunity is the rule rather than the exception." *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984). There are two general exceptions to this doctrine. First, sovereign immunity will not bar a claim against the State based on violations of the state or federal constitution. *Dep't of Revenue v. Kuhnlein*, 646 So. 2d 717, 721 (Fla. 1994) ("Sovereign immunity does not exempt the State from a challenge based on violation of the federal or state constitutions, because any other rule self-evidently would make constitutional law subservient to the State's will."). Second, the State is not immune from suit where it has waived its immunity pursuant to law. Art. X, § 3, Fla. Const. (allowing "[p]rovision[s] [to] be made by general law for bringing suit against the state as to all liabilities now existing or hereafter originating").

Pursuant to its enactment of section 768.28, Florida Statutes, the Legislature has explicitly waived the State's immunity from suit for liability in tort for damages. But this statutory waiver is strictly limited to circumstances where the State owes the plaintiff an underlying common law or statutory duty of care *and* where the challenged government actions are not discretionary and are not inherent in the act of governing. *Jordan v. Nienhuis*, 203 So. 3d 974, 976 (Fla. 5th DCA 2016). With this framework in mind, we consider whether the doctrine of sovereign immunity precludes Appellees' constitutional takings claims and their tort-based nuisance claims.

### 1. Constitutional Claims – Takings

Appellees claim that their property was unlawfully taken by the FWC in violation of article X, section 6 of the Florida

Constitution when the FWC issued deer dog hunting licenses and failed to prevent trespassing hunters and dogs from entering Appellees' property. The FWC argues that sovereign immunity bars Appellees' takings claims because the allegations in the complaint were legally insufficient.

When the trial court rejected the FWC's sovereign immunity arguments and denied summary judgment as a matter of law, it never addressed the legal sufficiency of Appellees' takings claims. Instead, the court summarily rejected the FWC's sovereign immunity arguments, concluding that the FWC "is not immune from constitutionally based takings claims." The trial court reached this conclusion in reliance on *Crowley Museum & Nature Center, Inc. v. Southwest Florida Water Management District*, 993 So. 2d 605 (Fla. 2d DCA 2008). The Second District in that case restated the unremarkable proposition that the doctrine of sovereign immunity does not bar a constitutional claim against the government – a point the government in that case conceded on appeal. *Id.* at 608. Instead, the government argued that the plaintiff's complaint did not set forth a facially sufficient inverse condemnation claim. *Id.* But the Second District declined to address the government's argument because the facial sufficiency of the inverse condemnation claim was not raised in the trial court. *Id.* Thus, the Second District in *Crowley* did not reach the question posed to the trial court in this case: whether sovereign immunity bars a suit asserting an inverse condemnation claim against the State when the plaintiff fails to set forth a legally sufficient constitutional claim.

The dissent argues that this Court may not consider the legal sufficiency of Appellees' takings claims asserting that the FWC framed the issue on appeal as a challenge to the court's sovereign immunity ruling, without reference to the legal sufficiency of the takings claims. We disagree with the dissent for several reasons.

First, the FWC did in fact address the legal sufficiency of both the takings and nuisance claims in its Initial Brief and Reply Brief. In the Summary of the Argument section of its Initial Brief, the FWC stated:

7

The circuit court also erred when it found as a matter of law that the Plaintiffs' claims were not barred by sovereign immunity. The state of Florida has not waived sovereign immunity for its functions which are tantamount to legislative acts. A plaintiff cannot pursue a lawsuit against FWC for acts that are basic judgmental or discretionary governmental functions. FWC (like any public body or governmental entity) is not liable to any individual based on its enactment of or failure to enact laws or regulations or by its issuance of or refusal to issue licenses, permits, variances or directions. In addition, there is no duty of FWC to prevent the misconduct of third persons.

FWC's decision to enact rules and regulations related to hunting in Blackwater WMA and its decision to issue permits for deer dog hunting in Blackwater WMA are decisions that fall within FWC's discretionary governmental functions. *The facts of this lawsuit as alleged by the Plaintiffs are not sufficient to maintain a cause of action against FWC for nuisance or takings claims.*

(Emphasis added). When arguing for the reversal of the trial court's imposition of an injunction, the FWC presented the following argument concerning the legal sufficiency of Appellees' claims, including the takings claims:

The circuit court did not make any of the required findings and as to the likelihood of success on the merits merely found as follows:

Whether, and the extent to which the FWC's actions constitute a taking will be decided based on the evidence submitted at the jury trial of this case, as will the amount of any resulting damages.

The circuit court's order granting the Plaintiffs' motion for temporary injunctive relief should be reversed also on the grounds that *it does not contain the findings*

8

*required by Florida law and therefore does not comply with Florida law.*

(Emphasis added). The FWC raised the argument again in the section arguing for reversal of the trial court's denial of its motion for summary judgment:

> The facts alleged as alleged by the Plaintiffs in the case are not sufficient to state a cause of action against FWC for which sovereign immunity has been waived.

The Initial Brief concluded with the FWC explicitly requesting the relief granted in this opinion:

> FWC also respectfully requests that this Court find that the circuit court erred when it declined to grant summary judgment in favor of FWC on the Plaintiffs' claims and remand the case for further proceedings consistent with this Court's ruling and what other and further relief this Court deems just and proper.

Contrary to the assertions made by the dissent, the majority is not addressing an issue that was never raised on appeal.

Second, implicit in the trial court's sovereign immunity ruling is the court's determination that the constitutional claims were legally sufficient. *See Cutler v. City of Jacksonville Beach*, 489 So. 2d 126, 128 (Fla. 1st DCA 1986) (observing that a claim must be legally sufficient to circumvent the application of the sovereign immunity doctrine). Only if Appellees pleaded the required elements of their takings claims could the trial court have ruled as a matter of law that sovereign immunity did not bar the claims against the FWC. *Id.* Third, the trial court's determination that sovereign immunity did not bar Appellees' takings claims against the FWC resolved a pure question of law. Thus, our review is de novo. *Plancher v. UCF Athletics Ass'n*, 175 So. 3d 724, 725 n.3 (Fla. 2015). And this Court is not bound by the trial court's view or its legal conclusions. *Leamer v. White*, 156 So. 2d 567, 571 (Fla. 1st DCA 2015).

9

To state a legally sufficient claim for takings, Appellees were required to allege that (1) the FWC required them to submit to a temporary or permanent physical occupation of their land or (2) the FWC enacted a regulation or imposed a condition that completely deprived them of all economically beneficial use of their land. *See Teitelbaum v. S. Fla. Water Mgmt. Dist.*, 176 So. 3d 998, 1003 (Fla. 3d DCA 2015); *Certain Interested Underwriters At Lloyd's London Subscribing to Certificate No. TPCLDP217477 v. City of St. Petersburg*, 864 So. 2d 1145, 1148 (Fla. 2d DCA 2003). Here, Appellees failed to allege either form of takings in their complaint.

The first category of takings occurs when "[t]he government physically occupies property [and] permanently deprives the owner of his 'bundle' of private property rights, including the right to possess and dispose, as well as the right to prevent the government from using the occupied area." *Fla. Game & Fresh Water Fish Comm'n v. Flotilla*, 636 So. 2d 761, 764 (Fla. 2d DCA 1994). A taking may also occur when the government has denied "a landowner all use of his property" on a temporary basis. *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty., Cal.*, 482 U.S. 304, 318 (1987). In *Flotilla*, the Commission established two preservation zones, consisting of forty-eight acres, to protect bald eagles' nests in a 173-acre plot of land that was being developed as a residential subdivision. 636 So. 2d at 763. The Second District rejected the plaintiffs' claim that the establishment of the preservation zones constituted a taking of their property because the plaintiffs were denied the opportunity to exploit a property interest they previously believed was available for development. The court determined the allegations were insufficient to establish a taking because the plaintiffs retained the desired use of the majority of their land. *Id.* at 765.

Here, Appellees do not, and cannot, allege that the FWC has forced them to submit to either a temporary or permanent physical occupation of their land. The alleged physical occupation – i.e., sporadic trespasses by deer dog hunters and their dogs during the forty-four days of the year when deer dog hunting is authorized – is transitory.

10

Neither do the Appellees allege that the FWC has deprived them of all economically beneficial use of their property. In order to constitute a taking, the government must deprive the property owner of substantially all use of his property. *Tampa-Hillsborough Cty. Expressway Auth. v. A.G.W.S. Corp.*, 640 So. 2d 54, 58 (Fla. 1994) ("A taking occurs where regulation denies substantially all economically beneficial or productive use of land.") Here, Appellees allege that they were deprived of their right to exclude people from their property during deer dog hunting season. But this allegation ignores the fact that Appellees are free to exclude the deer dog hunters and dogs from their property by pursuing criminal or civil remedies against the trespassing hunters and owners of the deer dogs. The FWC has not deprived Appellees of any right to pursue the third-party wrongdoers. Further, Appellees do not allege that they were deprived of *all* economically beneficial use of their property, particularly when the deer dog hunting season is limited to forty-four days and the trespasses were fleeting and sporadic. Because Appellees failed to plead the required elements to state legally sufficient takings claims against the FWC, the trial court should have granted the FWC's motion for summary judgment on sovereign immunity grounds.

### 2. Tort Claims – Nuisance

Turning to Appellees' nuisance claims, the FWC argued below and on appeal that sovereign immunity barred the claims. The trial court, again relying on *Crowley,* rejected the FWC's sovereign immunity argument. And, again, the trial court's reliance on *Crowley* was misplaced. The Second District in that case did not consider whether sovereign immunity barred the plaintiff's nuisance claims against the government because the plaintiff did not challenge the trial court's dismissal of the nuisance claims. 993 So. 2d at 607-08. Thus, *Crowley* offers no insight in determining whether sovereign immunity bars a claim of nuisance against the state and its subdivisions.

Here, the FWC's sovereign immunity defense to Appellees' nuisance claims emanates from section 768.28(1), Florida Statutes, and the doctrine of separation of powers. Section 768.28(1) provides a broad waiver of sovereign immunity to the

11

state and its subdivisions for tort liability "under circumstances in which the state or agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of the state." But even where the State owes a duty of care to a claimant, "constitutional separation-of-powers considerations require that certain discretionary or planning level governmental functions remain immune from tort liability." *Mosby v. Harrell*, 909 So. 2d 323, 326 (Fla. 1st DCA 2005). Thus, our analysis of whether sovereign immunity bars Appellees' nuisance claims against the FWC proceeds in two steps. First, we must determine whether there is an underlying common law or statutory duty of care to Appellees with respect to the FWC's actions to authorize deer dog hunting in the Blackwater WMA. *Trianon Park Condo. Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 917 (Fla. 1985). Second, we must consider whether the FWC's actions are discretionary or operational in nature. *Id.*

With regard to the first step, we conclude the FWC owes no duty to Appellees to stop third parties acting in violation of the FWC's rules and state law from trespassing onto Appellees' private property even though the FWC's rules authorize deer dog hunting on public lands adjacent to private property owned by Appellees. The FWC's rules require deer dog hunters to obtain licenses and permits, limit the season during which deer dog hunting occurs, define the public lands on which deer dog hunting may occur, and require the use of remote tracking and behavior correction devices on each dog. On those occasions where hunters or their dogs strayed from the public lands where they were authorized to hunt and trespassed onto Appellees' private property, they did so in violation of the FWC's rules and regulations, as well as state laws prohibiting trespass, criminal mischief, and the like. Because "there is no common law duty to prevent the misconduct of third persons," the FWC is not liable to Appellees for the failure of the hunters to abide by the FWC's rules and state law prohibiting trespass onto private property. *Id.*

Nor did the FWC owe a statutory or common-law duty to Appellees to monitor compliance by hunters with the FWC's deer dog hunting rules and regulations, particularly when the hunters had strayed beyond the public lands on which the FWC had

authorized hunting. *See Brown v. Dep't of Health & Rehab. Servs.*, 690 So. 2d 641 (Fla. 1st DCA 1997) (holding that HRS had no common-law duty to the parents of children who were sexually abused at a day-care facility to monitor compliance with the permit's condition that a known sexual abuser would not visit the day-care facility). We also note that some of the nuisances alleged in the complaint include criminal acts such as threats to destroy Appellees' property, threats to Appellees' safety, the setting of several arson fires, and the painting of graffiti on Appellees' property. It is absurd to suggest that the FWC is responsible for the criminal acts of third parties or that the deer dog hunting regulations invited such actions by the hunters. Because the FWC owed no duty to Appellees to prevent trespasses onto their property by the hunters or their dogs, the FWC was entitled to sovereign immunity.

But even if the FWC did owe a duty of care to Appellees to prevent the trespasses by third parties onto their private property, sovereign immunity would bar Appellees' nuisance claims because the FWC's actions to authorize hunting on public lands are purely discretionary functions of the FWC. *Mosby*, 909 So. 2d at 327. A discretionary function is one that involves "an exercise of executive or legislative power such that a court's intervention by way of tort law would inappropriately entangle the court in fundamental questions of policy and planning." *Id.* at 328. By contrast, an operational function is one that is not central or necessary to policy or planning, but instead relates to how those polices or plans will be implemented. *Id.* Certain discretionary functions are inherent in the act of governing and are immune from suit. *City of Freeport v. Beach Cmty. Bank*, 108 So. 3d 684, 687 (Fla. 1st DCA 2013); *Trianon Park*, 468 So. 2d at 918. These types of discretionary decisions may not be second guessed by the judiciary. *City of Ocala v. Graham*, 864 So. 2d 473, 476 (Fla. 5th DCA 2004) (holding that certain discretionary functions are inherent in the act of governing and are immune from suit).

Pursuant to its constitutional authority, a core function of the FWC is to determine where, when, and what types of hunting are permitted on public land, including deer dog hunting in the Blackwater WMA. "[H]unting, fishing, and the taking of game

13

are a valued part of the cultural heritage of Florida," and "the citizens of Florida have a right to hunt, fish, and take game, subject to the regulations and restrictions prescribed by general law and by s. 9, Art. IV of the State Constitution." § 379.104, Fla. Stat. To secure these rights, Florida's citizens established the FWC in their Constitution, vesting the FWC with exclusive legislative authority to regulate hunting. Art. IV, § 9, Fla. Const. The rules of the FWC have the force of a legislative act, and the Legislature is prohibited from adopting statutes that conflict with those rules. *Wakulla Commercial Fisherman Ass'n, Inc. v. Fla. Fish & Wildlife Conservation Comm'n*, 951 So. 2d 8, 9 (Fla. 1st DCA 2007) (quoting *Airboat Ass'n of Fla., Inc. v. Fla. Game & Fresh Water Fish Comm'n*, 498 So. 2d 629, 631 (Fla. 3d DCA 1986)). The supreme court has explicitly stated that the enactment of, or failure to enact, laws or regulations, or the issuance of, or refusal to issue, licenses, permits, variances, or directives are actions inherent in the act of governing. *Trianon Park*, 468 So. 2d at 919. Because the FWC's regulation of deer dog hunting involves actions inherent in the act of governing, those actions constitute discretionary acts and the doctrine of sovereign immunity bars Appellees' nuisance claims against the FWC. Thus, the trial court erred when it denied the FWC's motion for summary judgment.

## *B. Injunction*

Finally, the trial court's injunction violates the separation of powers doctrine, and the injunction is overly broad. Florida has a vigorous separation of powers doctrine. *Citizens for Strong Sch., Inc. v. Fla. State Bd. of Educ.*, 232 So. 3d 1163, 1170 (Fla. 1st DCA 2017) (acknowledging that the Florida Constitution requires a strict separation of powers between the branches of government). The judiciary violates the doctrine of separation of powers if it directs an administrative agency to perform its duties in a particular manner. *Fla. Dep't of Children & Families v. J.B.*, 154 So. 3d 479, 481 (Fla. 3d DCA 2015) (holding that the judicial branch is prohibited from interfering with the discretionary functions of an executive agency). Moreover, a court may not direct an agency to perform its duties in a manner that is not feasible. *Id.* Here, the trial court's injunction effectively prohibits the FWC from exercising its authority to issue licenses

14

and permits for deer dog hunting and requires the FWC to perform its duties in a way that is not feasible.

The injunction directs the FWC to "abate the nuisance of the deer hunting dogs from trespassing onto the property of the plaintiffs, and of the deer dogs and their hunters from interfering with the plaintiffs' right to the quiet enjoyment of their private property." The language of the injunction reflects an intent to preclude the FWC from issuing any deer dog hunting permits. And any doubt that this was the intended import of the injunction was removed when the trial court issued its order dissolving this Court's automatic stay of the 2016 order. Although the trial court acknowledged that "it would be inappropriate and overreaching for the Court to direct the FWC not to physically release the licenses and permits for the upcoming hunting season," in the very next paragraph of its order, the trial court determined that the issuance of licenses and permits for deer dog hunting "constitute[s] a nuisance and contribute[s] to the interference with the plaintiffs' right to the quiet enjoyment of their private property, and there is no other way to protect those constitutional rights at this juncture than to vacate the stay." Because the injunction requires the FWC to abate the nuisance and the order vacating the stay clarifies that the very issuance of permits and licenses for deer dog hunting constitutes a nuisance, it is crystal clear that the injunction prohibits the FWC from issuing permits and licenses for deer dog hunting in the Blackwater WMA.[2] Thus, the injunction leaves the FWC with no discretion or flexibility whatsoever to exercise its constitutional authority to regulate hunting and constitutes a judicial encroachment into the legislative authority of the FWC.

The injunction is also overly broad. An injunction may not be so broad as to leave parties against whom an injunction is

---

[2] This conclusion is supported by the following statement made by the trial court during a hearing addressing Appellees' motion to vacate the automatic stay: "I don't have an evidentiary basis as to how many licenses for the upcoming season have been issued. I'm quite frankly very disappointed to learn that any have been."

15

entered in doubt as to what they are permitted to do. *See Angelino v. Santa Barbara Enters., LLC*, 2 So. 3d 1100, 1104 (Fla. 3d DCA 2009). Here, the injunction is impossible for the FWC to comply with because it holds the FWC accountable for the actions of third parties over which the FWC has no control. Even if the FWC rescinded its rules and regulations authorizing deer dog hunting in the Blackwater WMA, and allowed no deer dog hunting whatsoever, the injunction as worded requires the FWC to abate the nuisance caused by trespasses by *unlicensed* deer dog hunters and their dogs onto Appellees' property. And, were the injunction permitted to take effect, the FWC and its Commissioners could be subject to contempt proceedings resulting in fines or incarceration. *See Dep't of Children & Families v. R.H.*, 819 So. 2d 858, 861-62 (Fla. 5th DCA 2002).

## *IV. Conclusion*

The FWC was entitled to summary judgment because Appellees' takings claims and nuisance claims were barred by the doctrine of sovereign immunity. The injunction entered by the trial court was overbroad and violated the separation of powers. Accordingly, we REVERSE the order denying the FWC's motion for summary judgment, DISSOLVE the injunction, and REMAND for entry of summary judgment in favor of the FWC.

B.L. THOMAS, C.J., concurs; LEWIS, J., dissents with opinion.

---

LEWIS, J., dissenting.

I respectfully dissent and would affirm the trial court in all respects. In doing so, I am mindful of the conflicting interests that exist in this case. However, for the following reasons, my view of the law when applied to the facts leads me to conclude that any issue regarding Appellees' takings claims is not properly before us, sovereign immunity does not apply to Appellees' nuisance claims against Appellant, and the temporary injunction was properly entered.

16

## FACTUAL AND PROCEDURAL HISTORY

In their Amended Complaint, each Appellee alleged both a takings claim and a nuisance claim against Appellant. Appellees also moved for the entry of a temporary injunction, requesting that the trial court enjoin Appellant from issuing any permits for deer dog hunting in a certain portion of the Blackwater WMA and enjoin any deer dog hunting from occurring in that same portion during the pendency of the suit. Appellant moved for summary judgment, arguing in part, "The plaintiffs have filed a nuisance count . . . and a takings count . . . . The Plaintiffs['] claims are barred by the doctrine of separation of powers, sovereign immunity and prior decisions of this court."

During the hearing on the motions for injunctive relief and summary judgment, several Appellees testified. One Appellee described deer dog hunting as being "extremely disruptive" and "potentially extremely dangerous" to his livestock, and he testified that he has to put his own dogs in kennels when he hears the hunting dogs approach his property, and it can take anywhere from forty-five minutes to an "hour plus" for Appellant's "guys" to arrive if he catches the hunting dogs. The hunters are not pleased if the dogs are in Appellee's possession, and they try to intimidate "you into releasing their dog back to them." There had been instances on Appellee's property during which his horses, because of the frenzy that ensues when the hunting dogs arrive, ran into fences and gates, tripped on tree stumps, and slipped on their side. When asked about harassment, Appellee testified that the Santa Rosa County Building Inspector threatened not to pass his building inspections, and a dog hunter threatened to burn his house down. His mailbox had been shot, and graffiti had been painted on the road in front of his house. Four arson fires had been set around his property between March 2014 and December 2014. He detailed his efforts to remedy the issue, including attending meetings, proposing rule changes, and meeting with one of Appellant's directors in October 2013.

Other Appellees testified about threats made to them in the past by various hunters, about the danger they felt in going into their yards during deer dog hunting season, about how the fences

they constructed did not stop the dogs from trespassing and causing damage upon their property, about dog fights that occurred between their own dogs and the hunting dogs, and about their repeated efforts to have Appellant remedy the situation. One Appellee testified that deer dog hunting interfered with the enjoyment of his property because he was not able to still hunt when "about 15 dogs will come running through [his] food plot." Another Appellee testified that the hunters had blocked "our roads and you have to wait for them to move," they threw all types of trash on her driveway, and although she had horses on her property at one time, she now keeps them at a friend's home because of how spooked they would become from the shooting and lights shining on them. Although a "correction device requirement" for the hunting dogs took effect on July 1, 2016, evidence presented below in support of Appellees' motion to vacate the automatic stay showed that dog trespasses continued on Appellees' property during the 2016-2017 hunting season. One of Appellant's employees testified that the potential for trespasses still existed, that the rule did not contain any training certification requirement for hunters, that hunters might not train their dogs properly using the collars, and that the rule did not mandate that collars automatically trigger themselves if the dogs crossed over certain GPS positions.

In the Order on Evidentiary Hearing and Hearing on Summary Judgment Motion, the trial court found that the credible testimony clearly and convincingly established that deer dog hunting days invade and interfere with Appellees' quiet enjoyment of their property, that the responsible hunter rule is not particularly helpful to private property owners who are no longer young and able-bodied, as catching a deer-chasing dog is not an easy task, and that many of the private property owners are effectively denied the use and enjoyment of their property during the 12.1% of the year when Appellant allows deer dog hunting in the Blackwater WMA. After detailing the testimony of Appellees, the trial court found that the case "should not be viewed as weighing competing interests of the private property owners against the desires of the FWC-authorized public hunters" and that the "rights of the private property owners to the enjoyment of their private land are not conditioned upon, nor subject to, those who want to hunt adjacent public lands." The

18

court further found that the rights of private property owners cannot and should not be interfered with by state government and those authorized to participate in deer dog hunting. The trial court explained that Appellees "are no longer asking the Court to change the FWC rules or regulations, nor to micromanage the deer hunting program that is part of FWC's wild game management responsibility." Instead, according to the trial court, Appellees were requesting a ruling that the flood of hunters and their dogs trespassing on their property constituted a nuisance and a taking of their property. The trial court found that Appellees set forth "proper claims for injunctive relief and claims for per se and non-per se taking[s] claims under the circumstances present here."

On the issue of sovereign immunity, the trial court determined that Appellant was not immune from liability for constitutionally-based takings claims or from nuisance claims. The trial court set forth:

> Whether, and the extent to which, FWC's actions constitute a taking will be decided based on the evidence submitted at the jury trial of this case, as will the amount of any resulting damages. For now, it is clear that the trespasses onto the plaintiffs' property and the interference with the plaintiffs' property rights is a direct result of the FWC's continued allowance of the deer dog hunting in an area known to contain private property, and does constitute a nuisance. The plaintiffs are entitled to entry of an injunction requiring FWC to abate the nuisance during the pendency of these proceedings.

The trial court ordered Appellant "to abate the nuisance of the deer hunting dogs from trespassing onto the property of the plaintiffs, and of the deer dogs and their hunters from interfering with the plaintiffs' right to the quiet enjoyment of their private property."

19

## ANALYSIS

### *Summary Judgment – Inverse Condemnation*

With respect to Appellees' takings claims, the majority reverses based upon its determination that Appellees failed to state legally sufficient claims. However, not only is the legal sufficiency of Appellees' takings claims not appealable in this non-final appeal, but Appellant, by not making any argument on the issue, abandoned any challenge regarding Appellees' takings claims on appeal.

This is an appeal of a non-final order pursuant to Florida Rule of Appellate Procedure 9.130. Rule 9.130(a)(3)(B) authorizes appeals of non-final orders that grant an injunction and Rule 9.130 (a)(3)(C)(xi) authorizes appeals of non-final orders that determine as a matter of law that a party is not entitled to sovereign immunity. The above-referenced appellate rules do not authorize an appeal from a non-final order denying a motion based on the sufficiency of a takings claim. In fact, had the non-final order on appeal simply determined that Appellees had set forth a sufficient takings claim, the order would not have been an appealable non-final order. As our Court in *Saidin v. Korecki*, 202 So. 3d 468, 470 (Fla. 1st DCA 2016), set forth:

> Additionally, our jurisdiction to review non-final orders granting injunctive relief under rule 9.130(a)(3)(B) does not extend to afford review of certain other matters the non-final order addresses. *Stanberry v. Escambia Cnty.*, 813 So.2d 278, 279 (Fla. 1st DCA 2002); see also *Hancock v. Suwannee Cnty. Sch. Bd.*, 149 So.3d 1188, 1190 (Fla. 1st DCA 2014). Accordingly, Appellant's challenges to the non-injunctive portions of the order are dismissed as non-appealable, non-final rulings. *See Amendments to Florida Rules of Appellate Procedure*, 780 So.2d 834, 863 (Fla.2000) (repealing rule 9.130(a)(3)(C)(iv) which allowed review of non-final orders determining "the issue of liability in favor of a party seeking affirmative relief."). This dismissal is without prejudice to Appellant's right to challenge future appealable orders entered in this case.

As such, the only appealable issues before this Court in this non-final appeal are whether Appellant is entitled to sovereign immunity and whether the trial court properly granted injunctive relief.

While the majority relies upon *Cutler v. City of Jacksonville Beach*, 489 So. 2d 126 (Fla. 1st DCA 1986), in support of its statement that the trial court could only have ruled as a matter of law that sovereign immunity did not bar the takings claims if Appellees pled the required elements, *Cutler* involved a plenary appeal by the appellant of the trial court's final order of dismissal with prejudice of the appellant's amended complaint. In *Cutler*, all the issues framed by the amended complaint, including whether the amended complaint stated a cause of action and the trial court's determination of the City's sovereign immunity, were subject to appellate review. Here, in contrast, Appellant is appealing a non-final summary judgment order pursuant to Rule 9.130, which limits the scope of Appellant's appeal to the trial court's determination as a matter of law that Appellant is not entitled to sovereign immunity and the temporary injunction. In *Cutler*, this Court noted that the appellant alleged in part that the appellee was legally responsible for acts of negligence on the part of the lifeguards or members of the beach patrol at the time of the appellant's daughter's drowning. *Id.* at 128. We set forth in part, "Such allegations concern acts at an operational level, which, if otherwise legally sufficient, are not barred by sovereign immunity . . . ." *Id.* We found that the appellant's allegation failed to state a cause of action against the appellee and, thus, found no error in the trial court dismissing the appellant's negligence count against the appellee. However, in reversing and remanding in part, we held that dismissal of the claim should have been without prejudice. Here, as stated, we are not faced with an appeal of a final order dismissing Appellees' claims. Instead, this non-final appeal addresses a summary judgment order that primarily determined that Appellees' claims were not barred by sovereign immunity as a matter of law.

Furthermore, even if we did have jurisdiction to address the legal sufficiency of Appellees' takings claims, Appellant does not argue on appeal that the trial court erred in determining that the

21

takings claims were legally sufficient. In fact, Appellant has not expressly challenged in its Initial Brief the trial court's determination that sovereign immunity does not bar Appellees' takings claims. Instead, in its Initial Brief, Appellant frames the issues on appeal by stating that it is appealing the entry of the temporary injunction and "the denial of [its] motion for summary judgment to the extent that the summary judgment determined as a matter of law that [it] is not entitled to sovereign immunity." Appellant's arguments regarding sovereign immunity pertain only to whether the doctrine bars Appellees' nuisance claims. Moreover, none of the cases cited by Appellant on appeal were cited in support of an argument that the trial court erred in determining that sovereign immunity did not bar Appellees' takings claims or that Appellees' takings claims were legally sufficient.

As this Court explained in *Anheuser-Busch Companies v. Staples*, 125 So. 3d 309, 312 (Fla. 1st DCA 2013), "[W]e are not at liberty to address issues that were not raised by the parties." The fact that Appellant did not challenge the trial court's determinations that Appellees' takings claims were not barred by sovereign immunity or that Appellees sufficiently pled their takings claims means that it abandoned those issues. *See Doe v. Baptist Primary Care, Inc.*, 177 So. 3d 669, 673 (Fla. 1st DCA 2015) (noting that an appellant who presents no argument as to why a trial court's ruling is incorrect on an issue has abandoned the issue and that it is not the function of an appellate court to re-brief an appeal). In *Parker-Cyrus v. Justice Administrative Commission*, 160 So. 3d 926, 927 (Fla. 1st DCA 2015), this Court held, in an opinion authored by Judge Rowe, that the petitioner abandoned a challenge to the trial court's factual findings by failing to raise any arguments attacking the order until his reply. In doing so, this Court noted that a "party abandons any issue that was not raised in the initial petition." *Id.* at 928; *see also Coolen v. State*, 696 So. 2d 738, 744 n.2 (Fla. 1997) (holding that the appellant's failure to fully brief and argue certain points on appeal constituted a waiver of the claims); *Duest v. Dugger*, 555 So. 2d 849, 852 (Fla. 1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation

22

does not suffice to preserve issues, and these claims are deemed to have been waived.").

Notwithstanding the foregoing, Appellees will be prevented from pursuing their takings claims against Appellant on a basis not argued by the parties on appeal. In fact, the first time the legal sufficiency of Appellees' takings claims was mentioned on appeal was in the majority opinion. Indeed, portions of the majority opinion closely resemble Appellant's summary judgment argument concerning the legal sufficiency of the takings claims that was made below. The majority's reliance upon various conclusory statements made in Appellant's Initial Brief, including statements made in the context of the entirely separate issue of the temporary injunction and statements made in the Summary of the Argument section, in no way supports its conclusion that the legal sufficiency of Appellees' takings claims is an issue that is properly before this Court. *See Caldwell v. Fla. Dep't of Elder Affairs*, 121 So. 3d 1062, 1064 (Fla. 1st DCA 2013) (holding that two perfunctory statements made by the appellant in her Initial Brief were insufficient to present an argument for appellate review). Instead, a review of the Initial Brief supports my view that the legal sufficiency issue is not properly before us on appeal. Absolutely nothing in Appellant's Initial Brief resembles what the majority has addressed in its opinion with respect to this issue. It is not an appellate court's function to take a conclusory statement made by a party and formulate an argument in support of that statement and in favor of the party. If Appellant wished to challenge on appeal the trial court's findings that Appellees' takings allegations were legally sufficient or that sovereign immunity does not bar the takings claims, it had a duty to set forth its arguments in favor of such a challenge. There is no question in this case that no such challenge was made as to these issues. Moreover, while the majority cites *Plancher v. UCF Athletics Association, Inc. v. UCF Athletics Association, Inc.*, 175 So. 3d 724, 729 n.3 (Fla. 2015), for the proposition that the issue of sovereign immunity is a legal issue subject to de novo review, our standard of review does not excuse the requirement that a party raise an issue on appeal before this Court may address it. For these reasons, the majority's reversal as to the takings claims is wholly inappropriate.

Alternatively, if we had jurisdiction to address the legal sufficiency of Appellees' takings claims and if Appellant had raised the issue on appeal, affirmance as to the issue would still be proper. The majority cites *Teitelbaum v. South Florida Water Management District*, 176 So. 3d 998 (Fla. 3d DCA 2015), and *Certain Interested Underwriters at Lloyd's London Subscribing to Certificate No. TPCLDP217477 v. City of St. Petersburg*, 864 So. 2d 1145 (Fla. 2d DCA 2003), for the proposition that Appellees were required to allege: (1) that Appellant required them to submit to a permanent or temporary physical occupation of their land or (2) that Appellant enacted a regulation or imposed a condition that completely deprived them of all economically beneficial use of their land. The Third District in *Teitelbaum* cited *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005), for the proposition that "the United States Supreme Court summarized the existing jurisprudence on this issue by holding that a per se taking occurs 'where government requires an owner to suffer a permanent physical invasion of her property,' or where the government passes and applies 'regulations [that] completely deprive an owner of all economically beneficial us[e]' of her property." 176 So. 3d at 1003. The Second District in *City of St. Petersburg* cited *Florida Game and Fresh Water Fish Commission v. Flotilla, Inc.*, 636 So. 2d 761, 761 (Fla. 2d DCA 1994), for the proposition that "[t]he required 'physical occupation' arises when the government 'permanently deprives the owner of his 'bundle' of private property rights . . . .'" 864 So. 2d at 1148. In *Flotilla*, the Second District explained that there was no physical taking in the case before it and that it was more truly characterized by the fact-intensive inquiry the law associates with regulatory takings rather than physical takings. 636 So. 2d at 764. The Second District, citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), noted that the government physically occupies property when it permanently deprives the owner of his bundle of private property rights. *Id.*

In *Arkansas Game and Fish Commission v. United States*, 568 U.S. 23, 26 (2012), the question presented was whether a taking may occur, within the meaning of the Takings Clause, when government-induced flood invasions, although repetitive, are temporary. In holding that such a temporary taking can occur, the Supreme Court set forth, "Ordinarily, this Court's

24

decisions confirm, if government action would qualify as a taking when permanently continued, temporary actions of the same character may also qualify as a taking." *Id.* The Court, citing *Loretto*, later set forth, "True, we have drawn some bright lines, notably, the rule that a permanent physical occupation of property authorized by government is a taking. . . . So, too, is a regulation that permanently requires a property owner to sacrifice all economically beneficial uses of his or her land." *Id.* at 31-32. The Court then stated, "But aside from the cases attended by rules of this order, most takings claims turn on situation-specific factual inquiries. . . . With this in mind, we turn to the question presented here–whether temporary flooding can ever give rise to a takings claim." *Id.* According to the Court, its decisions "confirm that takings temporary in duration can be compensable." *Id.* The Court explained that "[a] temporary takings claim could be maintained as well when government action occurring outside the property gave rise to 'a direct and immediate interference with the enjoyment and use of the land.'" *Id.* at 33 (citing *United States v. Causby*, 328 U.S. 256 (1946)). The Court later set forth, "Because government-induced flooding can constitute a taking of property, and because a taking need not be permanent to be compensable, our precedent indicates that government-induced flooding of limited duration may be compensable." *Id.* at 34; *see also Rubano v. Dep't of Transp.*, 656 So. 2d 1264, 1266 (Fla. 1995) ("A taking may occur in a wide variety of circumstances and may be either temporary or permanent.").

Based upon the foregoing, the majority's conclusion that Appellees' takings claims are legally insufficient because Appellees are unable to allege that their land has been physically occupied is erroneous. As the majority concedes, a temporary taking is a cognizable claim, and there is no question that government-sanctioned actions occurring outside Appellees' property have given rise to a "'direct and immediate interference with the enjoyment and use of the land.'" *Ark. Game & Fish Comm'n*, 568 U.S. at 33 (citation omitted). Moreover, while the majority is correct that the Florida Supreme Court in *Tampa-Hillsborough County Expressway Authority v. A.G.W.S. Corp.*, 640 So. 2d 54, 58 (Fla. 1994), set forth that a "taking occurs where regulation denies substantially all economically beneficial

or productive use of land," Appellees in this case did not allege that the takings were based upon a governmental regulation. Instead, they alleged per se takings claims and the physical occupation of their property.* It is important to note as well that although the majority characterizes the trespasses upon Appellees' property as sporadic, transitory, and fleeting to support its desired disposition in this case, the trial court found that the "credible testimony clearly and convincingly established that during the 12.1% of the year that comprises the FWC-approved deer dog hunting days, the plaintiffs' right to the quiet enjoyment of their property has been invaded and interfered with . . . ." For these reasons, affirmance would be warranted even if the legal sufficiency of Appellees' takings claims were properly before us.

Affirmance would also be in order if Appellant had challenged on appeal the trial court's determination that Appellees' takings claims were not barred by sovereign immunity. In addressing the merits of the issue, the trial court properly relied upon *Crowley Museum & Nature Center, Inc. v. Southwest Florida Water Management District*, 993 So. 2d 605 (Fla. 2d DCA 2008), for the proposition that sovereign immunity does not bar such claims. There, as the majority notes, the appellee conceded on appeal that the immunity statute at issue could not be constitutionally applied to preclude the inverse condemnation claim brought by the appellant. *Id.* at 608. However, what the majority fails to mention is the Second District's statement, "We conclude that the court erred in determining that the District enjoys sovereign immunity from a claim for inverse condemnation." *Id.* at 610; *see also Hansen v. City of Deland*, 32 So. 3d 654, 655 (Fla. 5th DCA 2010) ("A property owner can file an inverse condemnation claim to recover the value of property that has been *de facto* taken by a

---

* Although Appellees alleged a physical taking, it has also been held that the government "may take private property not only by physical occupancy, but also by imposing such burdens upon the use of property as to deprive the owner of the enjoyment of the land." *See Argent v. United States*, 124 F.3d 1277, 1283 (Fed. Cir. 1997).

government entity."); *Drake v. Walton Cty.*, 6 So. 3d 717, 720 (Fla. 1st DCA 2009) ("We have previously held that a county takes private property when it directs a concentrated flow of water from one property onto another, permanently depriving the owner of all beneficial enjoyment of their property."); *Schick v. Fla. Dep't of Agric.*, 504 So. 2d 1318, 1318 (Fla. 1st DCA 1987) ("[A] cause of action for inverse condemnation will lie against a government agency, which by its conduct or activities, has taken private property without a formal exercise of the power of eminent domain."). For the foregoing reasons, reversal of the summary judgment as to Appellees' takings claims is improper.

### *Summary Judgment – Nuisance*

With regard to Appellees' nuisance claims, while the majority concludes that Appellant is not liable to Appellees for hunters' misconduct, the situation at issue in this case is far different from the facts of *Brown v. Department of Health and Rehabilitative Services*, 690 So. 2d 641 (Fla. 1st DCA 1997), a case cited by the majority. There, this Court held that the agency had no common law duty to parents of children who were sexually abused at a daycare facility to monitor compliance with the permit's condition that a known sexual abuser would not visit the facility and noted that the complaints did not allege "the existence of any premises or location either owned, operated, or maintained by HRS." *Id.* at 644. Here, in contrast, Appellant authorized hunting on the public land at issue. As the supreme court has explained, "[O]nce a governmental entity builds or takes control of property or an improvement, it has the same common law duty as a private person to properly maintain and operate the property." *Trianon Park Condo. Ass'n v. City of Hialeah*, 468 So. 2d 912, 921 (Fla. 1985). Therefore, Appellees' contention that Appellant, once it made its decision to allow hunting in the Blackwater WMA, undertook the same duty to properly maintain and operate the property as a private person would is well-taken. *See Dep't of Transp. v. Burnette*, 384 So. 2d 916, 922 (Fla. 1st DCA 1980) ("Every remedy which would be available against an individual for such a repeated trespass or continuing nuisance . . . is now available against the State.").

27

Not only do I disagree with the majority that Appellant owes no duty to Appellees, but I also disagree with the majority's conclusion that Appellant's actions at issue are discretionary in nature and, thus, immune from suit under sovereign immunity. In *Trianon Park Condominium Ass'n,* the supreme court discussed sovereign immunity, explaining that "certain discretionary functions of government are inherent in the act of governing and are immune from suit." 468 So. 2d at 918. In determining whether an act is discretionary, a court should evaluate the case under the following test:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Id.* If all of the questions can be answered in the affirmative, then the governmental conduct is discretionary and non-tortious. *Id.* If one or more questions are answered in the negative, then further inquiry is necessary depending on the facts and circumstances involved. *Id.* at 918-19. The test is intended to assist in distinguishing between discretionary planning "or judgment phase" and the operational phase of government. *Id.* at 919.

The Second District in *Rumbough v. City of Tampa,* 403 So. 2d 1139, 1142 (Fla. 2d DCA 1981), explained that section 768.28 waives sovereign immunity in nuisance actions. It went on to conclude, however, that the appellants could not recover against the City of Tampa for its decision to expand a landfill because the operation of the landfill was "nothing more than an implementation of the decision which was made at the planning

28

level" and the City was exercising a discretionary function. *Id.* Were this a case where Appellant had decided to increase or expand deer dog hunting, *Rumbough* would support an argument that that decision was governmental in nature or discretionary and immune from challenge. However, the issue in this case is not the expansion of deer dog hunting. The issue concerns the management of deer dog hunting in the Blackwater WMA or, in other words, the implementation of Appellant's policy to allow hunting therein. As the supreme court has explained, an act is operational if it "'is one *not necessary to or inherent in policy or planning*, that merely reflects a secondary decision as to how those policies or plans will be implemented,'" whereas discretionary acts involve "'an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning.'" *Pinellas Park v. Brown*, 604 So. 2d 1222, 1226 (Fla. 1992) (holding that, in the absence of a serious emergency, the method by which law enforcement engages in hot pursuit constitutes an operational function that is not immune from liability if it is accomplished in a manner contrary to reason and public safety (citation omitted) (emphasis in original)). While Appellant is correct that its decision to allow deer dog hunting in the Blackwater WMA and to issue permits to hunters is a discretionary decision to which sovereign immunity would apply, this case deals with Appellant's implementation of its policies and plans regarding deer dog hunting in the Blackwater WMA. Moreover, the trial court did not inappropriately entangle itself in fundamental questions of policy and planning in this case.

In an out-of-state case involving deer dog hunting and private parties, the appellant was the owner of a plantation consisting of approximately 841 acres, and the appellee owned large tracts of land surrounding the appellant's land to the east, south, and west. *FOC Lawshe Ltd. P'ship, FOC v. Int'l Paper Co.*, 574 S.E.2d 228, 230 (S.C. Ct. App. 2002). The appellant invested time and money to improve its land to be used for hunting and to stock the property with wildlife. *Id.* The appellee primarily utilized its land for growing timber and also leased its property to several hunt clubs to use for hunting deer. *Id.* During hunting season, the hunt clubs commonly hunted deer on the same two

days that the appellant hunted deer and quail on its land. *Id.* The hunt clubs that leased the land from the appellee utilized dogs while they were hunting, whereas the appellant's hunters were "still" hunters and did not use dogs. *Id.* The dogs released by the hunt clubs frequently crossed over onto the appellant's property and disrupted the hunting by the appellant's members and guests. *Id.* The dogs had also raided quail pens on the appellant's property. *Id.* The appellant brought suit against the appellee, seeking a temporary restraining order and damages, basing its claim on a theory of nuisance arising from the disruption caused by trespassing dogs. *Id.* The trial court found that the appellant failed to establish the requirements necessary for issuing a temporary restraining order and denied the motion. *Id.* The appellee argued on appeal that it could not be liable for a nuisance arising from its tenants' use of the land. *Id.* at 231. The appellate court explained that the appropriate analysis was whether the appellee had complete control over the land and whether the alleged nuisance necessarily resulted from the ordinary use of the land by the appellee's tenants or for "the purpose for which [the lands] were let." *Id.* at 232. The appellate court determined that the appellant alleged sufficient facts to state a cause of action against the appellee. *Id.*

Although Appellant is correct that it is not the one allegedly trespassing on Appellees' property, the evidence established that the dogs of some hunters, whom Appellant permits to hunt on state-owned property, are trespassing on Appellees' land. If Appellant were a private party who owned the Blackwater WMA and trespassing dogs were running from that property onto Appellees' property, *FOC Lawshe Ltd. Partnership, FOC* would support a nuisance claim.

With respect to governmental entities allowing certain activities on state lands that create a nuisance, *Mark v. State ex rel. Department of Fish and Wildlife*, 84 P.3d 155 (Or. Ct. App. 2004), is instructive. In that case, the Oregon Department of Fish and Wildlife ("Department") and the Division of State Lands appealed from a judgment issuing a permanent injunction in a nuisance action. *Id.* at 155. It was noted that the Division of State Lands owned and the Department leased and managed property, including a public beach adjacent to the plaintiffs'

property.  *Id.*  The trial court determined that the intrusive presence and behavior of nude sunbathers using the public beach and the Department's failure to regulate or otherwise exercise control over certain aspects of that use constituted a private nuisance and issued a permanent injunction requiring the Department to abate the nuisance.  *Id.*  The Oregon appellate court explained that the gravamen of the plaintiffs' private nuisance claim was that the defendants, who owned and controlled the adjacent land, failed to adequately control the conduct of their invitees.  *Id.* at 161.  The appellate court further explained that the act of those invitees created a nuisance on the plaintiffs' land.  *Id.*  The court noted that the defendants challenged the scope and content of the permanent injunction and contended that the mandatory provisions offended principles of separation of powers in that the provisions impermissibly impinged on the prerogatives of the Department.  *Id.* at 165.  The appellate court rejected that argument, finding instead that the terms of the injunction afforded the Department considerable flexibility in choosing the means by which the mandated ends were to be accomplished.  *Id.*; *see also Maday's Wholesale Greenhouses, Inc. v. Indigo Grp., Inc.*, 692 So. 2d 207, 209 (Fla. 5th DCA 1997) (noting that the appellant argued that the manner in which Port Orange was using its own property constituted an unlawful diversion of surface water and represented a continuing trespass and nuisance, agreeing with the appellant that a governmental property owner does not enjoy sovereign immunity against a claim that the government's use of its own property results in an improper diversion of surface water onto private property, and holding that a cause of action could exist against Port Orange for injunctive relief or abating a private nuisance and related damages).

Just as the court determined in *Mark* that the Department's failure to regulate or exercise control over certain aspects of the use that it allowed on state property constituted a nuisance, Appellees should be permitted to pursue their claims that Appellant's alleged failure to regulate or exercise control over deer dog hunters and their dogs has created a nuisance.  While, as stated, Appellant's decision to allow deer dog hunting in the Blackwater WMA is a discretionary or planning-level decision, Appellant offers no legitimate reason why it should not then be

responsible for ensuring that hunters and their dogs are not creating a nuisance for adjacent property owners. That responsibility is operational in nature. Given such, the trial court did not err in denying summary judgment on the sovereign immunity issue.

### *Temporary Injunction*

Turning to the temporary injunction, a trial court must determine whether a petition for such demonstrates a prima facie, clear legal right to the relief requested. *SunTrust Banks, Inc. v. Cauthon & McGuigan, PLC*, 78 So. 3d 709, 711 (Fla. 1st DCA 2012). To establish a prima facie case for a temporary injunction, a petitioner must show four factors: (1) the likelihood of irreparable harm; (2) the unavailability of an adequate remedy at law; (3) a substantial likelihood of success on the merits; and (4) that a temporary injunction would serve the public interest. *Id.* The petitioner has the burden of providing competent, substantial evidence that satisfies each of these elements. *Id.* An appellate court's review of a ruling on a temporary injunction is hybrid in nature in that legal conclusions are reviewed de novo while factual findings are reviewed under the abuse of discretion standard. *Id.*

As the majority explains, Appellant argues that the temporary injunction is overly broad, is impossible to comply with, and effectively orders it to change its rules and regulations without expressly stating so. It also contends that the judiciary violates the separation of powers doctrine if it orders an administrative agency to perform its duty in a certain way. In support of this contention, Appellant cites *Crowley Museum & Nature Center, Inc*. That case, as previously cited, flowed from the appellee's issuance of permits allowing certain farming operations to engage in flood irrigation, which involved pumping groundwater from the underground aquifer and flooding the fields up to the root zones of the plants. 993 So. 2d at 607. The excess flood irrigation water flowed off certain farms into a swamp, and when the swamp basin filled, water then flowed downstream onto the appellant's land. *Id.* When the appellee could not provide a specific time period for correcting the flooding problem, which was causing trees to die, the appellant initiated

suit against the upstream farming operations. *Id.* The appellant raised claims for trespass and private nuisance against the appellee, as well as claims for inverse condemnation and negligence. *Id.* The trial court granted the appellee's motion to dismiss the claims on sovereign immunity grounds and found that injunctive relief would impermissibly require it under the separation of powers doctrine to direct the appellee as to how to remedy the flooding problem on the appellant's property. *Id.* On appeal, the appellant argued that the trial court erred in dismissing the complaint, but it did not challenge the court's ruling as it pertained to the claims for private nuisance, trespass, or negligence. *Id.* Instead, the appellant argued that the trial court erred in determining that section 373.443, Florida Statutes, which addresses immunity from liability pertaining to storm water management systems, provided for sovereign immunity from its inverse condemnation claim because such a constitutional claim could not be barred by a legislative grant of immunity. *Id.* at 608. The Second District affirmed the trial court's order dismissing the damages claims against the appellee "with the exception of the claim for inverse condemnation." *Id.* As to injunctive relief, the Second District determined that the trial court was correct that the separation of powers doctrine precluded it from entering an injunction that required an administrative agency to perform its duties in a particular way but that "a court may enter an injunction that gives an administrative agency the flexibility to choose the means by which to fulfill its duties." *Id.* at 609. While the Second District was concerned with the feasibility of the appellant's requests as to injunctive relief, it explained, "[T]he relief requested on the face of the [appellant's] complaint does not require the District to manage the lands in Flatford Swamp in a particular way but gives the District the flexibility to choose the means by which to manage its lands in Flatford Swamp." *Id.* The Second District concluded that the trial court erred in dismissing the claim for injunctive relief and in determining that the appellee enjoyed sovereign immunity from a claim for inverse condemnation. *Id.*

In granting the temporary injunction in this case, the trial court set forth, "FWC is hereby required to abate the nuisance of the deer hunting dogs from trespassing onto the property of the plaintiffs, and of the deer dogs and their hunters from interfering

33

with the plaintiffs' right to the quiet enjoyment of their private property." As in *Crowley Museum & Nature Center, Inc.*, where the injunction provided the appellee flexibility to choose the means by which to manage its land, Appellant was given the flexibility to choose the means by which it would abate trespassing dogs on Appellees' property. Appellant fails to explain how it is impossible to comply with the injunction.

Appellant cites *Angelino v. Santa Barbara Enterprises, LLC*, 2 So. 3d 1100 (Fla. 3d DCA 2009), for the proposition that an injunction must be specifically tailored to each case, may not be overly broad, and may not leave one against whom an injunction is entered in doubt as to what is supposed to be done. Appellant also cites *City of Oviedo v. Alafaya Utilities, Inc.*, 704 So. 2d 206 (Fla. 5th DCA 1998), for the proposition that there are circumstances in which an injunction may be entered by a trial court if an injunction does not unduly infringe on a city's regulatory powers. In *City of Oviedo*, the Fifth District affirmed a temporary injunction enjoining the appellant from withholding approval of planned sewer improvements by the appellee on the ground that the appellee refused to sign a franchise agreement proffered by the appellant. *Id.* at 207. The Fifth District noted that the preliminary injunction enjoined the appellant "'from withholding development on the grounds that Alafaya has not entered into a franchise agreement with the City'" and set forth that "[b]ecause Oviedo is still free to adopt *reasonable* rules and regulations pertaining to the use of its rights of way . . ., the injunction entered does not unduly hamper Oviedo's regulatory powers." *Id.* at 208 (emphasis in original).

Any argument that Appellant is in doubt as to what the trial court directed is meritless. The injunction is clear that Appellant is to abate the nuisance of deer hunting dogs on Appellees' property. As stated, the trial court left it up to Appellant to decide how that directive is to be accomplished and how the alleged nuisance in the Blackwater WMA is to be abated. Like the situation in *City of Oviedo*, the injunction in this case does not unduly hamper Appellant's authority in the Blackwater WMA.

34

In support of its decision, the majority refers to the trial court's order vacating the automatic stay that was entered while this appeal was pending and the court's language characterizing the issuance of licenses and permits as a nuisance. Unlike the majority, I do not read the order on appeal to prohibit the issuance of licenses and permits. As Appellant's counsel noted below about the language in the order vacating the stay, "[T]hat was something that wasn't included in the terms of the injunction orders that were entered a year ago," and the order vacating the stay "contained some new language that actually went a little bit further" than the order on appeal. In fact, we granted Appellant's motion to reinstate the automatic stay because the language used in the order vacating the stay improperly expanded the scope of the temporary injunction to include the issuance of licenses and permits. Thus, an affirmance of the order on appeal would in no way prohibit Appellant from issuing hunting permits. Instead, Appellant would be free to choose how to keep hunting dogs from trespassing onto Appellees' property. As such, entry of the injunction was appropriate.

## CONCLUSION

In conclusion, because the trial court did not err in denying the motion for summary judgment and in entering the temporary injunction, I would affirm.

_____

Rebekah A. Davis of Dunlap & Shipman, P.A., Tallahassee; Tracey Hartman, Tallahassee; and John P. Joy and Jose E. Pagan of Walton Lantaff Schroeder & Carson LLP, Fort Lauderdale, for Appellant.

David A. Theriaque, S. Brent Spain, and Terrell K. Arline of Theriaque & Spain, Tallahassee, for Appellees.

_____

35

## ORDER ON MOTION FOR REHEARING EN BANC

A judge of this Court requested that this cause be reheard en banc in accordance with Florida Rule of Appellate Procedure 9.331(d). All judges in regular active service have voted on the request. Less than a majority of those judges voted in favor of rehearing en banc. Accordingly, the request for rehearing en banc is denied.

B.L. THOMAS, C.J., and WETHERELL, ROWE, RAY, OSTERHAUS, KELSEY, WINOKUR, JAY, and WINSOR, JJ., concur.

WOLF and BILBREY, JJ., dissent.

MAKAR, J., dissents in an opinion in which LEWIS, J., joins.

ROBERTS and M.K. THOMAS, JJ., recused.

_____

MAKAR, J., dissenting from the denial of rehearing en banc.

This case—which pits homeowners' property rights against the regulatory powers of the State—involves the scope of judicial review when an appellant fails to raise and argue a legal claim as a basis for reversal on appeal. The Florida Fish and Wildlife Conservation Commission limited its interlocutory appeal to only a *nuisance* theory, its briefs neither raising nor arguing a *takings* theory for reversal. May the appellate panel nonetheless resolve and dismiss the entire case in favor of the Commission on a basis neither raised nor briefed nor argued by any party on appeal? If so, may it do so without notice and supplemental briefing? These questions are worthy of en banc review, and we ought to have addressed them directly rather than passively accepting the panel majority's expansion of judicial power and, as a result, government regulatory powers to take private property.

Ordinarily, the failure to raise an issue on appeal is deemed a waiver unless an exception applies such as the correction of

fundamental error. *See City of Miami v. Steckloff*, 111 So. 2d 446, 447 (Fla. 1959) ("An assigned error will be deemed to have been abandoned when it is completely omitted from the briefs."); *see generally* Philip J. Padovano, Waiver, 2 Fla. Prac., App. Practice § 8:10 (2017 ed.) ("A point that was raised before the trial court but not addressed in the brief or petition filed in the appellate court cannot be used as a ground for reversal. Failure to pursue the argument on appeal or review is a waiver of the point."); *id.* §§ 8:8, 27:3 (discussing fundamental error in civil and criminal cases, respectively); *see also* Tracy S. Carlin, *Unpreserved Errors Are All the Same, Right? Not Exactly*, 92 FLA. B.J. 35, 35 (March 2018) ("In general, the fundamental error doctrine is the same in both criminal and civil cases under Florida law, but courts are apparently more inclined to find fundamental error in criminal cases—where an individual's liberty is at stake—than they are in civil cases.").

From time to time, appellate courts broaden their scope of review beyond the issues raised, reflecting tension between two judicial camps: one applying waiver strictly, the other less so (the former generally focuses on the process, the latter generally focuses on the substantive issues). The protocols and parameters for raising new issues is somewhat ill-defined.

> If a court raises new issues not presented by an appellant, the practice can run counter to the fundamental principle that an issue is waived if not raised on appeal. Differing views exist, though the following are general guidelines:
>
> > Generally, supplemental briefs may be filed pursuant to the provisions of the relevant appellate rules or by the consent of the court, subject to the restriction that an issue or claim may not be asserted for the first time in a supplemental brief. However, when the claim implicates fundamental constitutional rights, the court may consider a claim that was not included in the original brief and is raised in a

supplemental brief. Courts may require that supplemental briefs be filed for issues not raised by the parties or when there remains confusion or doubt concerning an issue. Whether courts allow supplemental briefs to be filed depends in part on the timing of the request in relation to the status of the appeal.

5 AM. JUR. 2D *Appellate Review* § 519 (2013) (footnotes omitted). In the context of *Anders* briefs, the Florida Supreme Court has broadly said that "an appellate court can order supplemental briefs in any case before it, regardless of the type of brief originally filed." *In re Order of First Dist. Ct. of Appeal Regarding Br. Filed in Forrester v. State*, 556 So. 2d 1114, 1117 (Fla. 1990) ("We approve the district court's requiring supplemental briefs as being within the inherent powers of the court."). In a non-*Anders* context, Judge Cope, writing for himself, noted that it "appears that an appellate court has the power to order supplemental briefing and to consider the briefs when filed. This amounts to an exception to the waiver rule" that would otherwise foreclose review of new issues raised by the court absent fundamental error. *R & B Holding Co., Inc. v. Christopher Adver. Grp., Inc.*, 994 So. 2d 329, 336-37 (Fla. 3d DCA 2008) (Cope, J., concurring in part, dissenting in part) ("court has the discretion to order supplemental briefs on an issue raised by the court sua sponte."). The Eleventh Circuit, for example, has a strict standard:

> Parties must submit all issues on appeal in their initial briefs. When new authority arises after a brief is filed, this circuit permits parties to submit supplemental authority on "*intervening* decisions or *new* developments" regarding issues already properly raised in the initial briefs. Also, parties can seek permission of the court to file supplemental briefs on this new authority. But parties cannot properly raise new issues at supplemental briefing, even

> if the issues arise based on the intervening decisions or new developments cited in the supplemental authority.
>
> *United States v. Nealy*, 232 F.3d 825, 830 (11th Cir. 2000) (internal citations omitted). *See also* [Barry A.] Miller, [*Sua Sponte Appellate Rulings: When Courts Deprive Litigants of An Opportunity To Be Heard*, 39 San Diego L. Rev. 1253, 1256 (Fall 2002),] [] at 1307-08 (contrasting adversary process model, which focuses narrowly only on issues raised by parties and applies waiver rule rotely, with equity model, which focuses more broadly on achieving justice—or avoiding injustice—and applies waiver rule less strictly).

*Florida Carry, Inc. v. UNF*, 133 So. 3d 966, 988 n.29 (Fla. 1st DCA 2013) (Makar, J., concurring).

Our Court has no formal protocol that defines a panel's discretion to broaden its scope of appellate review as to unraised issues; nor do we have a formal protocol for when supplemental briefs ought to be requested.[1] On this point, in *Florida Carry v. UNF*, the three-judge panel asked for supplemental briefing on a constitutional issue the university had not raised, which—after en banc review was granted—led to written opinions discrediting/championing that issue as a basis for *affirmance*. 133 So. 3d at 976-77 ("The original panel asked the parties to be prepared to speak on the application of article IX, section 7, in oral argument and then required briefing on the issue.") (comparing majority opinion of Judge Roberts on art. IX, s. 7, Fla. Const., with dissenting opinion of Judge Padovano). The en banc majority touched upon the practice of a three-judge panel raising new issues in the context of the "tipsy coachman" rule, which holds that *affirmance* is permissible, even if the trial court's

---

[1] Our internal operating procedures address only supplemental briefing in en banc cases where requested by a third or more of participating judges. *See* Internal Operating Procedure 6.9 (July 2018).

39

reasoning was incorrect, if the record supports the result of a trial court's ruling.[2] *Id.* at 976-77. Because the three-judge panel had ordered supplemental briefing, the en banc majority said that the "dissent is entitled to make a 'tipsy coachman' argument in order *to affirm.*" *Id.* (emphasis added). The majority went on to say, however, that "any argument that UNF's regulation fails because it did not have authority delegated by the board of governors constitutes a 'tipsy coachman' *reversal*—a jurisprudential device unknown in the law." *Id.* at 977 (emphasis added).

Turning to this case, the Commission raised only *nuisance*-based grounds for reversal on appeal; it did not raise and argue the *takings* claim. No briefs or citations of authority suggested the takings claim was an issue for resolution on appeal.[3] The

---

[2] *See Robertson v. State*, 829 So. 2d 901, 906 (Fla. 2002) ("This longstanding principle of appellate law, sometimes referred to as the 'tipsy coachman' doctrine, allows an appellate court to affirm a trial court that 'reaches the right result, but for the wrong reasons' so long as 'there is any basis which would support the judgment in the record.'").

[3] The Commission's initial brief raised two issues: (a) whether the elements for the temporary injunction of a *nuisance* had been met; and (b) whether the Commission had sovereign immunity because the homeowners' *nuisance* claim was directed at its discretionary functions versus operational functions (the former having immunity, the latter not). Neither issue addressed a *takings* theory. The twelve cases cited in its initial brief addressed the two *nuisance-related* issues raised on appeal. Eleven of the cases make no mention of a takings theory. Within one of the twelve cases is discussion of a takings claim, *Crowley Museum & Nature Ctr., Inc. v. Sw. Fla. Water Mgmt. Dist.*, 993 So. 2d 605, 608 (Fla. 2d DCA 2008), but the Commission cited the case solely for matters unrelated to a takings theory. *See Initial Br.* at 12-14. The Commission's reply brief was similarly limited to only nuisance-based arguments. *Parker-Cyrus v. Justice Admin. Comm'n*, 160 So. 3d 926, 928 (Fla. 1st DCA 2015) (An "argument may not be raised for the first time in a reply."). Finally, the only takings argument the

panel majority, however, says that it may undertake "de novo" appellate review of this unraised theory because "*implicit* in the trial court's sovereign immunity ruling is the court's determination that the constitutional [takings] claims were legally sufficient." (Emphasis added). But it was incumbent on the Commission to raise this issue on appeal in some meaningful way; we typically don't have jurisdiction to raise and resolve an issue as a basis for reversal, implicit or otherwise, in a trial court's ruling, unless it is brought to our attention and briefed on appeal (with the exceptions discussed above). Close questions arise as to whether an issue or argument has been presented on appeal, but that's not the case here.

The panel majority also says the Commission "argues that sovereign immunity bars [the property owners'] takings claims because the allegations in the complaint were legally insufficient," but no such argument was presented in the Commission's briefs. The only mention of a takings claim in the initial brief are *two words*—"or takings"—interlineated in a sentence near the end of FWC's summary of the argument ("The facts of this lawsuit as alleged by the Plaintiffs are not sufficient to maintain a cause of action against FWC for nuisance *or takings* claims.") (emphasis added). No legal argument, citation of authority, or recitation of FWC's trial court analysis on the takings claims was presented thereafter. Our supreme court has said that this type of "cursory claim"—unsupported by legal argument—is "insufficiently pled" and thereby deemed a waiver of the issue. For example, in *Bryant v. State*, 901 So. 2d 810, 827-28 (Fla. 2005), the court deemed an issue waived when the only reference to it was a phrase ("illegal coercion by police") in an

Commission raised *in the trial court* was narrow and abbreviated: it claimed the property owners had not pled a "per se" takings claim (versus other types), citing a couple of takings cases. *See Comm.'s Mot. for Summ. J.* at 11-12. That takings argument was not raised on appeal, and none of the cases the Commission cited in the trial court as to the takings claim were cited in its initial brief.

opening paragraph and a "brief paragraph" thereafter containing a factual recitation of police conduct. *Id.* at 827. "Such a cursory argument is insufficient to preserve the issue for consideration." *Id.*; *see also Duest v. Dugger*, 555 So. 2d 849, 852 (Fla. 1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived."). Likewise, the supreme court found waiver where the "entirety of [appellant's] argument in his initial brief is comprised of two sentences that do not cite any case law or refer to any facts that could have supported his argument . . . . Accordingly, we conclude that this claim is insufficiently pled." *Knight v. State*, 225 So. 3d 661, 675 (Fla. 2017).

These cases illustrate that appellants cannot simply insert a legal phrase (here, "or takings") in an initial brief, make no argument (or even a "cursory" one), and expect an appellate court to address the matter. For this reason, the property owners surely were taken aback when they found out the panel majority had not only vacated the temporary injunction but had dismissed their entire case on the basis of an unraised claim—and done so without notice to, and supplemental briefing by, the parties. The result of adjudicating the takings claim without briefing by the parties is that the law of takings is now a bit more muddled,[4] a

---

[4] This nuisance-based takings claim is a hybrid between a regulatory taking (which requires no physical invasion but must be a total deprivation of use of property, even temporarily) and a physical taking (a trespass or physical invasion), best reflected in foundational cases such as *Richards v. Washington Terminal Co.*, 233 U.S. 546, 557 (1914). In *Richards*, the Supreme Court held that a plaintiff could seek relief for a taking if the governmental action imposed "special and peculiar" damages on a neighboring property owner (who was next to a new railroad tunnel). *Id.*; *see also Argent v. United States*, 124 F.3d 1277, 1284 (Fed. Cir. 1997) (Plaintiffs stated takings claim where "burdensome pattern of [flight] activity" was alleged.). The principle in this line of cases is that a government-created nuisance may support a takings claim

reason why the property owners have justifiably sought rehearing and rehearing en banc based on decisional conflicts, as well as a certified question: "Whether a compensable taking may arise from recurrent trespasses and physical incursions upon private property, even if of finite duration, by invitees licensed by the Florida Fish and Wildlife Conservation Commission to conduct hunting in an adjacent state wildlife management area."

Even if supplemental briefing had been sought from the parties, the basis for doing so would be to *reverse* the injunction (and dismiss the case), which *Florida Carry* says can't be done, thereby creating direct intramural precedential tension. The issue of the extent to which a panel can expand the scope of appellate review is worthy of the Court's collective discussion, no matter how it is resolved. Absent that discussion, this case sets a precedent for panels having discretion to expand the scope of appellate review without notice to the parties or supplemental briefing to *reverse* on a legal theory the appellant did not raise on

---

if the burden imposed is peculiar/special as to a limited set of property owners who bear the burden disproportionately compared to others. Harm arising from reasonable and normal uses, if widely shared by the public at large, would not be actionable as a taking; but burdens from a nuisance endured by a handful of neighboring property owners may be actionable (i.e., states a claim for relief). *See Richards*, 233 U.S. at 557; *Argent*, 124 F.3d at 1284. Of course, not every nuisance is a taking, only those that fit this narrow category as defined by the caselaw. Under the facts alleged and developed in discovery, the property owners have to take precautionary steps and refrain from normal use of their properties for over a month during the holiday season each year when an influx of hunting dogs and hunters come onto their property (akin to taking precautions if ash or fumes invade from a neighboring waste treatment plant). By dismissing the takings claim outright on appeal—without the issue having been raised or even briefed—the property owners have been deprived of the ability to argue the takings issue and the law on takings has been clouded.

appeal; no exception to the waiver rule is required. It ratchets back the rote application of waiver rules, thereby lessening the strictures of the adversary process model. Some will lament this change, some will not, but the net result is that an objection that an issue, argument or theory "wasn't raised" is no longer an insurmountable bar to a panel's adjudication of a case. As the general discussion above makes evident, however, much room exists for debate and clarification of the extent of appellate court power to do justice in each case within the parameters of an adversarial model of adjudication, making the denial of en banc review a lost opportunity.